## THE McLAIN NO. 237.

### McLAIN LINE, Inc., v. UNITED STATES et al.

District Court, S. D. New York.

Dec. 4, 1946.

Macklin, Brown, Lenahan & Speer, of New York City (Leo F. Hanan, of New York City, of counsel), for libelant.

John F. X. McGohey, U. S. Atty., of New York City (Purdy & Lamb, by Edmund F. Lamb, all of New York City, of counsel), for respondents.

Burlingham, Veeder, Clark & Hupper, of New York City (Frederic Conger and James J. Conran, both of New York City, of counsel), for Pennsylvania R. Co.

KENNEDY, District Judge.

On February 1, 1944, at about 3:00 P.M., 8 light barges were lying at the Pennsylvania Railroad stake boat in the lower bay. The wind was blowing from northwest at about 45 miles an hour. The tide was flood. In consequence of the force and direction of the wind, the scows were tailing over toward Governors Island from the stake boat, when the tug Amboy, owned and operated by the respondent-impleaded The Pennsylvania Railroad Company, appeared for the purpose of picking them up and towing them through the Kill Van Kull. As finally made up, the boats were in three tiers. In the first tier the port hawser boat was the Cape Daniels, the starboard hawser boat Cape Dewey, and in between them was the Meyers. Astern of Cape Daniels was libelant's canal boat McLain #237.[1] Another barge, Mary R., was lying on McLain #237's starboard side, and on the starboard side of Mary R. was Tracy #12. Astern of Mary R. and Tracy #12 respectively were two unidentified barges.[2]

The master of the Amboy, after securing his hawsers to Cape Daniels and Cape Dewey, rounded to on left rudder and headed for the Kill. At about 3:10 P.M. Port Vincent, a diesel powered steel tug owned by the War Shipping Administration and operated under an agency agreement by respondent McAllister Lighterage Line, Inc., had been ordered to join the tow as a helper tug. Upon receiving the call, she left Pier H, New Jersey, and headed for the stake boat. It is at this point that the dispute of fact arises.

Libelant's witnesses, all bargees,[3] testified that as the tug Amboy and tow were bound in a generally southerly direction toward buoy No. 27 on the right-hand side of the channel, the tug Port Vincent came up on the port quarter of McLain #237 and struck her a hard blow. As a result of this, these bargees say that the bow line of McLain #237 parted, and the chock to which it was secured pulled out.

---

[1] McLain #237 is about 100 feet in length and 30 feet in beam. She is made of wood. She first came into libelant's ownership in 1938.

[2] The scope of the towing hawsers was about 150 feet. The space between the stern of the head barge and the bow of the barge astern was about 8 feet.

[3] The bargee of McLain #237 could not be found and did not testify at the trial.

Respondents United States of America and McAllister Lighterage Line, Inc., deny all this. Their tug boat captain says that when he arrived at the stake boat, Amboy had already cast off with the tow and was lying on a northwest heading, the tow tailing over toward Governors Island, in between the Pennsylvania stake boat and the Reading stake boat. Fearing that the tow might drift in a *southerly* direction and foul the Reading stake boat, Port Vincent's captain says he came around under the tow, brought his stem lightly against the midship portion of McLain #237, made fast, and then commenced to push against the port side of McLain #237. After this he says on signal from Amboy he put out a backing line and strap, and reversed his engines with the object of pulling the tow over toward the Brooklyn shore to facilitate the round to which Amboy was then making. The master of Amboy had no recollection of any such maneuver by Port Vincent.

The master of Port Vincent admitted that he was "hustling" to the stake boat and this at least is consistent with the story of libelant's witnesses that when Port Vincent came on the scene she was traveling at a high rate of speed. The evidence of the master of the tug Amboy persuades me that his tug, which develops 1600 horsepower, could have had no trouble handling 8 light boats, even under the weather conditions of February 1, 1944, and that the tug and tow never could have fetched up in the situation described by the master of Port Vincent. Actually it was a physical impossibility for the tug and tow, on leaving the Pennsylvania stake boat to make headway toward the Jersey shore and thus cross the line between the Pennsylvania and Reading stake boats. It was suggested at the trial that perhaps Amboy was pulling toward the Jersey shore in order to hold the tow up against the wind and keep it clear of the Governors Island anchorage ground, but I have the greatest confidence that the master of the tug Amboy did no such thing, because it was wholly unnecessary. True enough, just before he started his round to there might be a slight tendency on the part of the tow to go up into the wind but that would be momentary merely, and as soon as the starboard side of the barges were even slightly broadside to the wind, that tendency would be offset.

If I am right in all this, libelant's story is more believable than that of respondents. The record suggests that Port Vincent may have been a little late in arriving. If that is so, she very likely did what the bargees say she did, namely, approached the port quarter of McLain #237 at high speed after the tug Amboy and her tow had rounded to, and while it was on a southerly course. These bargees place the scene of the collision as being off the mouth of the Greenville Channel. Respondents say the only contact between the tug Port Vincent and McLain #237 was in the neighborhood of the stake boats. I do not understand that there was any attempt on the part of the bargees to be exact about the scene of the collision, and it is very probable that it occurred somewhat further to the north than they say it did and at or near a spot between the Reading stake boat and the mouth of the Greenville Channel.

Respondents at the trial insisted very vigorously that McLain #237 had suffered no damage to her port quarter at all, that she had been in other collisions, that the damage formerly suffered by her had not been repaired, and that these items were duplicated in the survey made immediately after the claim of a collision on February 1, 1944. This proof was offered, of course, on the theory that libelant's claim is made up out of the whole cloth. But it is impossible for me to reject the testimony of the bargees who testified for the libelant. It may be that the quantum of libelant's claim for damage is overstated, but that question can easily be dealt with by the commissioner.

The theory of the impleading petition is that the proximate cause of the collision was the negligence of The Pennsylvania Railroad Co., because it controlled the movements both of the tug Amboy and the tug Port Vincent and under the then weather conditions should not have permitted the tow to be cast loose from the stake boat until the helper tug arrived on the scene. This argument really is based upon the supposition (which I find not to be the fact) that the tug and tow had

somehow drifted in a southerly direction toward the Reading stake boat, and on the belief (which I do not share) that under the circumstances it was hazardous for Amboy to attempt to voyage without assistance at the start. I think the real function of Port Vincent was to pick up way boats, and perhaps to assist in the handling of the tow at the entrance to the Kill Van Kull. Even the master of Port Vincent did not seem to support the theory of the impleading petition that the operation undertaken by the Amboy, namely, casting the tow loose from the stake boat and starting the voyage without a helper was particularly hazardous.

It follows that libelant is entitled to a decree against one of the respondents and that the respondent-impleaded, The Pennsylvania Railroad Co., is entitled to a decree of dismissal. The United States of America has been made a party here on the theory that it is responsible as owner; McAllister Lighterage Line, Inc., on the theory that it is responsible as the operating agent. The question is one of possession, command and control, and I cannot see how it can be divided. This question was not debated at the trial. Unless the advocates can agree which is the proper respondent, I will undertake to decide it on such proof as I have.

I have filed findings of fact and conclusions of law. Submit decrees.